UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**HEIDI JOHNSON, BRYAN ROSENBLITHE,
AMY GARSON, and SREBRINA BALOVA, on
behalf of themselves and all others similarly
situated,**

                              **Plaintiffs,**

              **-against-**

**TERRANCE BRENNAN, ARTISANAL
FROMAGERIE & BISTRO, LLC, and
ARTISANAL GROUP, LLC,**

                              **Defendants.**

No. 10 Civ. 4712 (CM)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/16/11

# DECISION AND ORDER GRANTING MOTION FOR CERTIFICATION OF THE SETTLEMENT CLASS, FINAL APPROVAL OF THE CLASS ACTION SETTLEMENT, AND APPROVAL OF THE FLSA SETTLEMENT

McMahon, J.:

Plaintiffs have moved for Certification of the Settlement Class, Final Approval of the Class Action Settlement, and Approval of the FLSA Settlement ("Plaintiffs' Motion for Final Approval"). Because the parties' $440,000 settlement of this wage and hour class and collective action satisfies all of the criteria for final approval, the motion is granted.

## PROCEDURAL BACKGROUND

### I.     The Parties

Plaintiffs Heidi Johnson, Brian Rosenblithe, Srebrina Balova, and Amy Garson are former tipped hourly service workers at Artisanal Fromagerie & Bistro, LLC ("Artisanal") in New York City. Artisanal is owned and operated by Artisanal Group, LLC and Defendant Terrance Brennan.

### II.    Pre-Litigation Mediation

On May 14, 2009, Plaintiffs sent Artisanal's owner, Terrance Brennan, a letter in which they summarized their potential claims and invited him and/or his counsel to engage in pre-litigation settlement discussions. Bien Decl. ¶ 4. In response to the letter, the parties engaged in a series of discussions over several months regarding Plaintiffs' claims and Defendants' defenses, and negotiated a process for attempting to resolve them, including entering into a tolling agreement, negotiating a confidentiality agreement, and engaging in an informal exchange of documents and other data to assess the claims and calculate damages. *Id.* at ¶ 5. The parties hired a private mediator with experience in wage and hour law, Ruth Raisfeld, and engaged in a day-long mediation session on April 7, 2010. *Id.* at ¶ 9. Unfortunately, the mediation was unsuccessful. *Id.* at ¶ 11.

### III.   Litigation

On June 17, 2010, Plaintiffs commenced this action as a putative class action under

1

Federal Rule of Civil Procedure 23 and as a collective action under 29 U.S.C. § 216(b), bringing

claims under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").

*Id.* at ¶ 12.  Plaintiffs alleged that Defendants violated the FLSA and NYLL by: (1) unlawfully

distributing a portion of customer tips to tip-ineligible maître d's and cheese counter employees

(called "fromagers"); (2) unlawfully taking a "tip credit" and paying Plaintiffs and class

members less than the minimum wage; (3) charging Plaintiffs and class members for required

uniforms; (4) failing to pay statutory uniform maintenance amounts; and (5) failing to pay

Plaintiffs and class members spread-of-hours pay when they worked ten or more hours in a day.

On July 13, 2010, Plaintiffs sent the Court a pre-motion letter requesting permission to

move for court-authorized notice pursuant to 29 U.S.C. § 216(b).  *Id.* at ¶ 13.  On July 23, 2010,

Defendants sent the Court a letter in response, indicating their willingness to agree to notice and

proposing that the parties attempt to agree to the terms of a proposed notice.  *Id.* at ¶ 13.

Plaintiffs also sought permission to move to strike several of Defendants' affirmative defenses

on the ground that they failed to meet the pleading requirements of Federal Rule of Civil

Procedure 8.  *Id.* at ¶ 14.  On September 24, 2010, Defendants filed an Amended Answer.  *Id.* at

¶ 14.

The parties negotiated the terms of a proposed notice and submitted the notice to the

Court for its consideration on September 16, 2010.  *Id.* at ¶ 15.  On September 17, 2010, the

Court approved the parties' proposed notice and authorized its distribution to potential collective

members.  *Id.* at ¶ 15.  In response to the notice, 70 individuals joined the lawsuit as collective

members by submitting consent to join forms.  The deadline for submitting a consent form was

March 6, 2010.  *Id.* at ¶ 15.

2

## IV.    Renewed Settlement Discussions

Shortly after the Court entered a discovery schedule on September 13, 2010, the parties renewed their settlement discussions. *Id.* at ¶ 16. After several months of further negotiations, the parties reached agreement on a final settlement agreement. *Id.* at ¶ 16. All parties have signed the agreement. Ex. A (Settlement Agreement).

## V.    Discovery

The parties engaged in substantial informal discovery before agreeing to resolve this case. Plaintiffs' counsel interviewed Plaintiffs and several other class members regarding Defendants' tip distribution policies, uniform policies, tip credit notice policies, and the duties of individuals who received tips. Bien Decl. ¶ 8. Defendants produced a representative sampling of payroll data and tip sheets from January 2006 to August 2009, personnel files, job descriptions of the allegedly tip-ineligible fromagers and maître d's, service and training manuals, and copies of the minimum wage posters that Defendants displayed at the restaurant during the relevant period. *Id.* at ¶ 6. From this data, Plaintiffs were able to calculate damages on a classwide basis and evaluate the strengths and weaknesses of their claims. *Id.* at ¶ 7.

## SUMMARY OF THE SETTLEMENT TERMS AND ADMINISTRATION

## I.    The Settlement Fund

The Settlement Agreement creates a fund of $440,000 ("the Fund"). Bien Decl. ¶ 19; Ex. A (Settlement Agreement) ¶ 3.1(A). The Fund covers attorneys' fees and costs, class members' awards, and service payments to the named Plaintiffs. Bien Decl. ¶ 19; Ex. A (Settlement Agreement) ¶ 3.1(A). None of the Fund will revert to Defendants. Bien Decl. ¶ 19; Ex. A (Settlement Agreement) ¶ 3.1(D). On May 31, 2011, Defendants deposited the Fund into an

escrow account pursuant to the terms of the Settlement Agreement. Bien Decl. ¶ 28; Ex. A

(Settlement Agreement) ¶ 3.1(B); Ex. B (Patton Decl.) ¶ 4.

## II.     Release

The Settlement Agreement provides that every class member who does not timely opt out

of the settlement will release Defendants from all NYLL wage and hour claims that were

asserted or that could have been asserted in the Complaint. Ex. A (Settlement Agreement) ¶

4.1(A). Class members who do not opt out and who sign their settlement checks will be deemed

also to have provided their written consents to join the FLSA collective and to have released

their FLSA claims. *Id.* at ¶ 4.1(B).


## III.    Eligible Employees

The eligible employees consist of two overlapping groups. The "NYLL Class" consists

of all servers, runners, bussers, barbacks and bartenders who work or have worked at Artisanal

between June 17, 2003 and January 31, 2011, and who do not timely opt-out of the settlement.

*Id.* at ¶¶ 1.7; 2.4(A); 2.4(C). The "FLSA Class" consists of all servers, runners, bussers,

barbacks and bartenders who work or have worked at Artisanal between June 17, 2006 and

January 31, 2011 and who timely submitted a consent to join form pursuant to the notice process

authorized by the Court. *Id.* at ¶ 1.5.

## IV.    Allocation Formula

Each class member will receive a proportional share of the Fund based on the number of

weeks he or she worked at Artisanal and whether he or she filed a consent to join the FLSA

Class. *Id.* at ¶ 3.4(A). Each member of the NYLL Class will be assigned one point for each

week worked at Artisanal from June 17, 2003 to January 31, 2011. *Id.* at ¶ 3.4(A)(1). Each

member of the FLSA Class will be assigned an additional point for each week worked at Artisanal from June 17, 2006 to January 31, 2011. *Id.* at ¶ 3.4(A)(2). The additional point is in recognition of the risks these class members incurred by joining the lawsuit and the fact that they affirmatively sought to protect their FLSA rights, including the right to obtain 100% liquidated damages on top of their unpaid wages. Bien Decl. ¶ 21.

## V.    Attorneys' Fees, Litigation Costs and Service Awards

Class Counsel have filed a Motion for Approval of Attorneys' Fees and Reimbursement of Expenses and a Motion for Approval of Service Awards simultaneously with this Motion.

## VI.    Settlement Claims Administrator

Defendants retained Settlement Services, Inc. ("SSI") as the claims administrator ("Claims Administrator"). *Id.* at ¶ 26.  SSI has significant experience administering class action settlements, including settlements of wage and hour class and collective actions.  *Id.* at ¶ 26. The Claims Administrator's fees will be paid by Defendants.  Ex. A (Settlement Agreement) ¶ 2.1.

On July 18, 2011, the Claims Administrator mailed the Court-approved notice ("Notice") to a list of 392 class members that had been provided by Defendants.  Bien Decl. ¶¶ 30-31; Ex. B (Patton Decl.) ¶¶ 5-6.  The Claims Administrator traced for new addresses using a locator service.  Bien Decl. ¶ 32; Ex. B (Patton Decl.) ¶ 7.  As a result, the Claims Administrator found potential new addresses for 56 class members and re-mailed Notices to those 56 addresses.  Bien Decl. ¶ 32; Ex. B (Patton Decl.) ¶ 7.  In addition, nine Notices were re-mailed to class members whose forwarding addresses were provided by the Post Office.  Bien Decl. ¶ 32; Ex. B (Patton Decl.) ¶ 7.

On or about August 12, 2011, Class Counsel provided the Claims Administrator with the names of two additional people to be added to the class list and instructed the Claims Administrator to modify the dates of employment for three class members whose dates were incorrect on the class list that Defendants had provided.  Bien Decl. ¶ 33; Ex. B (Patton Decl.) ¶ 8.  After recalculating the awards to class members as a result of these adjustments, the Claims Administrator determined that the awards of the other 389 class members will decrease by approximately 4.4%.  Bien Decl. ¶ 33; Ex. B (Patton Decl.) ¶ 9.  On August 24, 2011, the Claims Administrator mailed Notices to the two added class members and the three class members whose employment dates had been modified.  Bien Decl. 34; Ex. B (Patton Decl.) ¶ 10.  Their

6

deadline to opt out of or object to the settlement is September 23, 2011. Bien Decl. ¶ 34; Ex. B

(Patton Decl.) ¶ 10. For all other class members, the deadline to opt out of or object to the

settlement will expire prior to or on the date of the fairness hearing. Bien Decl. ¶ 36.

The Notice advised class members, among other things, that they could object to or

exclude themselves from the settlement. Bien Decl. ¶ 35; Ex. C (Notice). As of August 30,

2011, no class member has objected to the settlement or requested exclusion. Bien Decl. ¶ 35;

Ex. B (Patton Decl.) ¶ 11.

DISCUSSION

## I.     The Settlement Class Meets the Legal Standard for Class Certification.

When faced with a proposed class action settlement, courts first examine whether the

settlement class can be certified. *Denney v. Deutsche Bank AG,* 443 F.3d 253, 270 (2d Cir.

2006). On May 17, 2011, the Court preliminarily certified the settlement class. The Court now

grantS final certification OF the following class for purposes of effectuating the settlement:

> All servers, runners, bussers, barbacks and bartenders who work or worked at
> Artisanal Fromagerie & Bistro between June 17, 2003 and January 31, 2011.

Under Rule 23, a class action may be maintained if all of the prongs of Rule 23(a) are

met, as well as one of the prongs of Rule 23(b). Rule 23(a) requires that: (1) the class is so

numerous that joinder of all members is impracticable; (2) there are questions of law or fact

common to the class; (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class; and (4) the representative parties will fairly and adequately

protect the interests of the class. Fed. R. Civ. P. 23(a).

Rule 23(b)(3) requires the Court to find that:

> [Q]uestions of law or fact common to the members of the class predominate over
> any questions affecting only individual members, and that a class action is
> superior to other available methods for the fair and efficient adjudication of the

7

controversy.

*Id.* at (b)(3). In the Second Circuit, "Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility" in evaluating class certification. *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 31 (E.D.N.Y. 2006) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)).

### A. Numerosity

Numerosity is satisfied when the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[N]umerosity is presumed at a level of 40 members . . . ." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Plaintiffs easily satisfy the numerosity requirement because there are approximately 394 class members. Bien Decl. ¶ 29.

### B. Commonality

The proposed class also satisfies the commonality requirement, the purpose of which is to test "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Although the claims need not be identical, they must share common questions of fact or law. *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 181 (W.D.N.Y. 2005). There must be a "unifying thread" among the claims to warrant class certification. *Kamean v. Local 363, Int'l Bhd. of Teamsters*, 109 F.R.D. 391, 394 (S.D.N.Y. 1986). Courts construe the commonality requirement liberally. *Frank*, 228 F.R.D. at 181.

This case involves several common factual and legal issues, including whether Defendants: (1) misappropriated tips by unlawfully distributing a portion to tip-ineligible fromagers and maître d's; (2) failed to pay spread-of-hours pay; (3) failed to reimburse workers

8

for the cost of required uniforms; and (4) failed to pay statutory uniform maintenance payments. These alleged wage and hour violations – involving common operative facts stemming from corporate policies that affected class members in the same way – are sufficient to meet Rule 23(a)'s commonality factor. *See Campos v. Goode*, No. 10 Civ. 224, 2010 WL 5508100, at *1 (S.D.N.Y. Nov. 29, 2010) (commonality satisfied where restaurant workers alleged overtime, tip misappropriation, spread of hours, and uniform claims); *deMunecas v. Bold Food, LLC*, No. 09 Civ. 440, 2010 WL 3322580, at *2 (S.D.N.Y. Aug. 23, 2010) (same); *Prasker v. Asia Five Eight LLC*, No. 08 Civ. 5811, 2010 WL 476009, at *2 (S.D.N.Y. Jan. 6, 2010) (same).

### C. Typicality

Typicality is also satisfied. Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376 (internal quotation marks omitted). "Like the commonality requirement, typicality does not require the representative party's claims to be identical to those of all class members." *Frank*, 228 F.R.D. at 182. "[M]inor variations in the fact patterns underlying individual claims" do not defeat typicality when the defendant directs "the same unlawful conduct" at the named plaintiffs and the class. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). Here, Plaintiffs' claims arise from the same factual and legal circumstances that form the bases of class members' claims. Plaintiffs and class members were all required to share their tips with allegedly tip-ineligible employees, were not paid spread-of-hours pay and uniform maintenance pay, were not reimbursed for required uniforms, and, as a result, suffered the same injuries. *See deMunecas*, 2010 WL 3322580, at *2 (typicality satisfied where plaintiffs and class members suffered same injury as a result of defendants' tip allocation and other wage and hour policies); *Prasker*, 2010 WL 476009, at *2 (same).

### D.     Adequacy of the Named Plaintiffs

Plaintiffs are adequate class representatives.  Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "The adequacy requirement exists to ensure that the named representatives will have an interest in vigorously pursuing the claims of the class, and . . . have no interests antagonistic to the interests of other class members." *Toure v. Cent. Parking Sys. of N.Y.*, No. 05 Civ. 5237, 2007 WL 2872455, at *7 (S.D.N.Y. Sept. 28, 2007) (internal quotation marks omitted); *see also Campos*, 2010 WL 5508100, at *2; *McMahon v. Olivier Cheng Catering & Events, LLC*, No. 08 Civ. 8713, 2010 WL 2399328, at *2 (S.D.N.Y. Mar. 3, 2010).  "[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Dziennik v. Sealift, Inc.*, No. 05 Civ. 4659, 2007 WL 1580080, at *6 (E.D.N.Y. May 29, 2007) (internal quotation marks omitted).  Here, Plaintiffs satisfy the adequacy requirement because there is no evidence that Plaintiffs' and class members' interests are at odds. *See Diaz v. E. Locating Serv., Inc.*, No. 10 Civ. 4082, 2010 WL 5507912, at *3 (S.D.N.Y. Nov. 29, 2010) (finding adequacy requirement met where plaintiffs' interests were not antagonistic or at odds with those of class members); *deMunecas*, 2010 WL 3322580, at *2 (same); *McMahon*, 2010 WL 2399328, at *2 (same).

### E.     Certification Is Proper Under Rule 23(b)(3).

Rule 23(b)(3) requires that the common questions of law or fact "predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This inquiry examines "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Satisfaction of

10

Rule 23(a) "goes a long way toward satisfying the Rule 23(b)(3) requirement of commonality." *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986).

### 1.   Common Questions Predominate.

Predominance requires that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (internal quotation marks omitted), *abrogated on other grounds by Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*, 471 F.3d 24 (2d Cir. 2006). The essential inquiry is whether "liability can be determined on a class-wide basis, even when there are some individualized damage issues." *In re Visa Check*, 280 F.3d at 139. Where plaintiffs are "unified by a common legal theory" and by common facts, the predominance requirement is satisfied. *McBean v. City of N.Y.*, 228 F.R.D. 487, 502 (S.D.N.Y. 2005).

Here, all members of the class are unified by common factual allegations – that all class members were subjected to the same allegedly unlawful tip appropriation policies and other wage and hour policies. They are also unified by a common legal theory – that these tip and wage and hour policies violated New York law. These common issues predominate over any issues affecting only individual class members. *See Campos*, 2010 WL 5508100, at *2 (predominance requirement satisfied where restaurant workers alleged tip misappropriation and other wage and hour violations), *deMunecas*, 2010 WL 3322580, at *3 (same); *Prasker*, 2010 WL 476009, at *2 (same).

The only individualized issues pertain to the calculation of damages, and it is well-settled that individualized damages calculations do not defeat predominance. *See Frank*, 228 F.R.D. at

11

183 (collecting cases holding that calculation of damages in overtime litigation does not impact the predominance analysis). Plaintiffs therefore satisfy Rule 23(b)(3).

## 2.    A Class Action Is a Superior Mechanism.

Plaintiffs also satisfy the superiority requirement. Superiority analyzes whether "the class action device [is] superior to other methods available for a fair and efficient adjudication of the controversy." *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968). Rule 23(b)(3) sets forth a non-exclusive list of relevant factors, including whether individual class members wish to bring, or have already brought, individual actions; and the desirability of concentrating the litigation of the claims in the particular forum. Fed. R. Civ. P. 23(b)(3).[1]

Class adjudication of this case is superior to individual adjudication because it will conserve judicial resources and is more efficient for class members, particularly those who lack the resources to bring their claims individually. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998); *Diaz*, 2010 WL 5507912, at *3; *Campos*, 2010 WL 5508100, at *2; *deMunecas*, 2010 WL 3322580, at *3. Plaintiffs and class members have limited financial resources with which to prosecute individual actions. Concentrating the litigation in this Court is desirable because the allegedly wrongful conduct occurred within its jurisdiction.

## II.    The Proposed Settlement Is Fair, Reasonable, and Adequate and Should Be Approved in All Respects.

Rule 23(e) requires court approval for a class action settlement to insure that it is

---

[1]    Another factor, whether the case would be manageable as a class action at trial, is not of consequence in the context of a proposed settlement. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial.") (internal citation omitted); *Frank*, 228 F.R.D. at 183 ("The court need not consider the [manageability] factor, however, when the class is being certified solely for the purpose of settlement.") Moreover, denying class certification on manageability grounds is "disfavored" and "should be the exception rather than the rule." *In re Visa Check*, 280 F.3d at 140 (internal quotation marks omitted).

procedurally and substantively fair, reasonable and adequate. Fed. R. Civ. P. 23(e)(2). To determine procedural fairness, courts examine the negotiating process leading to the settlement. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). To determine substantive fairness, courts determine whether the settlement's terms are fair, adequate, and reasonable according to the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

Courts examine procedural and substantive fairness in light of the "strong judicial policy in favor of settlement" of class action suits. *Wal-Mart Stores*, 396 F.3d at 116 (internal quotation marks omitted); *see also Spann v. AOL Time Warner, Inc.*, No. 02 Civ. 8238, 2005 WL 1330937, at *6 (S.D.N.Y. June 7, 2005) ("[P]ublic policy favors settlement, especially in the case of class actions"). When, as here, "a settlement is negotiated prior to class certification, . . . it is subject to a higher degree of scrutiny in assessing its fairness." *D'Amato*, 236 F.3d at 85; *Spann*, 2005 WL 1330937, at *5. Even under high scrutiny, procedural and substantive considerations support approving the proposed settlement.

### A. The Proposed Settlement Is Procedurally Fair.

The proposed settlement is procedurally fair because it was reached through arm's-length negotiations and after experienced counsel had evaluated the merits of Plaintiffs' claims. *See Diaz*, 2010 WL 5507912, at *4 (finding settlement to be "procedurally fair, reasonable, adequate, and not a product of collusion" where plaintiffs had conducted a thorough investigation and engaged in extensive, arm's-length negotiations involving counsel and the services of an experienced class action mediator); *deMunecas*, 2010 WL 3322580, at *4 (same). A "presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."

13

*Wal-Mart Stores,* 396 F.3d at 116 (internal quotation marks omitted); *see also D'Amato,* 236 F.3d at 85. "Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement." *In re EVCI Career Colls. Holding Corp. Sec. Litig.,* No. 05 Civ. 10240, 2007 WL 2230177, at *4 (S.D.N.Y. July 27, 2007); *see also In re Top Tankers, Inc. Sec. Litig.,* No. 06 Civ. 13761, 2008 WL 2944620, at *3 (S.D.N.Y. July 31, 2008); *In re BankAmerica Corp. Sec. Litig.,* 210 F.R.D. 694, 700 (E.D. Mo. 2002).

Here, the settlement was reached after Plaintiffs conducted a thorough investigation and evaluated the claims, and after extensive negotiations between the parties. Plaintiffs engaged in substantial discovery before agreeing to resolve this case, including interviewing class members, reviewing Defendants' payroll data, tip sheets, service and training manuals, personnel files, documents reflecting the duties of the fromagers and maître d's, and copies of the minimum wage posters that Defendants displayed at Artisanal during the relevant time period. Bien Decl. ¶¶ 6, 8. From these sources of information, Plaintiffs were able to evaluate the strengths and weaknesses of their claims. *Id.* at ¶ 7.

The parties attended an all-day mediation with an experienced employment law mediator, Ruth Raisfeld, on April 7, 2010. *Id.* at ¶ 9. The parties did not reach agreement during the mediation and continued to litigate the case and exchange information to facilitate settlement. *Id.* at ¶¶ 11-16. After several months of litigation and further negotiations, the parties reached and executed a detailed final settlement agreement. *Id.* at ¶¶ 12-16. At all times during the settlement process, the parties negotiated on an arm's-length basis. *Id.* at ¶ 17. These arm's-length negotiations involved counsel and a mediator well-versed in wage and hour law, raising a presumption that the settlement achieved meets the requirements of due process. *See Wal-Mart Stores,* 396 F.3d at 116; *Diaz,* 2010 WL 5507912, at *4; *deMunecas,* 2010 WL 3322580, at *4.

14

**B.** **The Proposed Settlement Is Substantively Fair.**

In *Grinnell Corp.*, the Second Circuit provided the analytical framework for evaluating the substantive fairness of a class action settlement. 495 F.2d at 448, *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000). The *Grinnell* factors guide district courts in making this determination. They are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. 495 F.2d at 463.

All of the *Grinnell* factors weigh in favor of final approval of the Settlement Agreement.

### 1.  Litigation Through Trial Would Be Complex, Costly, and Long (*Grinnell* Factor 1).

By reaching a favorable settlement prior to dispositive motions or trial, Plaintiffs avoid significant expense and delay and ensure a speedy, risk-free recovery for the class. "Most class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub. nom. D'Amato*, 236 F.3d 78. This case is no exception, with approximately 394 putative class members with fact-intensive claims under both federal and state law.

Although there has been significant informal discovery, additional discovery would be required, including depositions of Plaintiffs, class members, Defendants, and Defendants'

15

employees and managers, before the case would be ready for trial. The trial would be fact-intensive. Preparing and putting on evidence at such a trial would time and resources, both the parties' and the court's. A trial on damages, even on a representative basis, would be costly and would further defer closure. Any judgment would likely be appealed, thereby extending the duration of the litigation. This settlement, on the other hand, makes monetary relief available to class members in a prompt and efficient manner. Therefore, the first *Grinnell* factor weighs in favor of final approval.

## 2. The Reaction of the Class Has Been Positive (*Grinnell* Factor 2).

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002). The lack of class member objections "may itself be taken as evidencing the fairness of a settlement." *RMED Int'l, Inc. v. Sloan's Supermkts., Inc.*, No. 94 Civ. 5587. 2003 WL 21136726, at *1 (S.D.N.Y. May 15, 2003).

Here, the Notice included a detailed explanation of the allocation formula and an estimate of each class member's award. Ex. C (Notice) ¶¶ 7-8. The Notice also informed class members of their right to object to or exclude themselves from the settlement and explained how to do so. Bien Decl. ¶ 35; Ex. C (Notice) ¶¶ 12; 15-16. As of August 30, 2011, no class member has objected to or opted out of the settlement. Bien Decl. ¶ 35; Ex. B (Patton Decl.) ¶ 11. This favorable response demonstrates that the class approves of the settlement and supports final approval. *See Diaz*, 2010 WL 5507912, at *4 (finding the fact that no class member objected to settlement or requested exclusion demonstrated that the class approved of the settlement); *deMunecas*, 2010 WL 3322580, at *5 (same); *Wright v. Stern*, 553 F. Supp. 2d 337, 345 (S.D.N.Y. 2008) ("The fact that the vast majority of class members neither objected nor opted out is a strong indication that the proposed settlement is fair, reasonable, and adequate.")

16

**3.     Discovery Has Advanced Far Enough to Allow the Parties to Responsibly
Resolve the Case (*Grinnell* Factor 3).**

The parties have completed enough discovery to recommend settlement. The pertinent

question is "whether counsel had an adequate appreciation of the merits of the case before

negotiating." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) (quoting

*In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001)) (internal quotation marks omitted).

"[T]he pretrial negotiations and discovery must be sufficiently adversarial that they are not

designed to justify a settlement . . . but an aggressive effort to ferret out facts helpful to the

prosecution of the suit." *In re Austrian & German Bank Holocaust Litig*, 80 F. Supp. 2d at 176

(quoting *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 263 (S.D.N.Y. 1998)) (internal

quotation marks omitted). The parties' discovery here meets this standard. As discussed above,

Plaintiffs obtained substantial amounts of data, including payroll records, tip sheets, employee

manuals, and other relevant information. Bien Decl. ¶ 6. In addition, the parties engaged in

litigation, many months of negotiation, and a day-long mediation during which they engaged in a

vigorous exchange regarding their respective claims and defenses. *Id.* at ¶¶ 4-16. Plaintiffs also

interviewed class members about the claims and performed detailed damages calculations based

on the data that Defendants provided. *Id.* at ¶¶ 7-8.

Based on these circumstances, the parties were well-equipped to evaluate the strengths

and weaknesses of the case. *See Frank*, 228 F.R.D. at 185 (approving settlement of case "in

relatively early stages of discovery" where parties had exchanged extensive information

pertaining to the identities of class members and to Defendant's time and pay practices and

where counsels' negotiations, while "cooperative," had "been in no way collusive"); *see also*

*Diaz*, 2010 WL 5507912, at *5; *deMunecas*, 2010 WL 3322580, at *5 (approving settlement

where plaintiffs had obtained discovery through an informal exchange of information and

17

engaged in mediation); *Prasker*, 2010 WL 476009, at \*5 (same). This factor also weighs in favor of final approval.

### 4. Plaintiffs Would Face Real Risks if the Case Proceeded (*Grinnell* Factors 4 and 5).

Although Plaintiffs' case is strong, it is not without risk. "Litigation inherently involves risks." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997). Indeed, "[i]f settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome." *In re Ira Haupt & Co.*, 304 F. Supp. 917, 934 (S.D.N.Y. 1969); *see also Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698, 2007 WL 7232783, at \*6 (S.D.N.Y. June 25, 2007). In weighing the risks of establishing liability and damages, the Court "must only weigh the likelihood of success by the plaintiff class against the relief offered by the settlement." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 177 (quoting *Marisol A. v. Giuliani*, 185 F.R.D. 152, 164 (S.D.N.Y. 1999)) (internal quotation marks omitted).

A trial on the merits would involve significant risk as to both liability and damages, particularly with respect to the minimum wage and tip misappropriation claims because of their fact-intensive nature. For instance, Plaintiffs may have difficulty showing that the maître d's and fromagers with whom Plaintiffs and class members were required to share their tips were ineligible to receive tips under the FLSA and NYLL.

While Plaintiffs believe that they could ultimately establish Defendants' liability, this would require significant factual development and favorable outcomes at trial and on appeal, both of which are inherently uncertain and lengthy. The proposed settlement alleviates this uncertainty. This factor therefore weighs in favor of final approval.

### 5.   **Establishing a Class and Maintaining It Through Trial Would Not Be Simple (*Grinnell* Factor 6).**

The risk of obtaining class certification and maintaining it through trial is also present, though it is admittedly remote.  Although Defendants stipulated to conditional certification of the FLSA collective, they may have moved for decertification of the collective after the conclusion of discovery, requiring briefing by the parties.  Furthermore, the Court has not yet certified the class under Rule 23, and such a determination would likely be reached only after another round of extensive briefing.  Defendants may argue, both on a decertification motion and a Rule 23 motion, that individual questions preclude class certification, including whether the relevant policies were uniform throughout the class period and whether the duties of allegedly tip-ineligible workers varied.  If a class were certified, Defendants might seek permission to file an interlocutory appeal under Federal Rule of Civil Procedure 23(f).  Risk, expense, and delay permeate such a process.  Settlement eliminates this risk, expense, and delay.  This factor also favors final approval.

### 6.   **Defendants' Ability to Withstand a Greater Judgment Is in Doubt (*Grinnell* Factor 7).**

During the parties' mediation, Defendants claimed that their financial integrity was at risk.  Bien Decl. ¶ 10.  To verify this, Plaintiffs requested and were provided with copies of Artisanal's financial records and Defendant Brennan's personal financial records.  *Id.*  The records suggest that Defendants might be unable to withstand a judgment that is substantially greater than the settlement amount and present a significant risk of collection.  *Id.*  Even if Defendants could withstand a greater judgment, a "defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair."  *Frank*, 228 F.R.D. at 186 (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 178 n.9

19

(alterations and citation omitted)). Here, the settlement eliminates the risk of collection. Defendants have already paid the Fund into escrow pursuant to the Settlement Agreement. Bien Decl. ¶ 28; Ex. A (Settlement Agreement) ¶ 3.1(B); Ex. B (Patton Decl.) ¶ 4. Accordingly, this factor also favors final approval.

### 7.    The Settlement Fund Is Substantial in Light of the Possible Recovery and the Attendant Risks of Litigation (*Grinnell* Factors 8 and 9).

The $440,000 settlement amount represents a good value given the attendant risks of litigation and the collection risks discussed above, even though the recovery could be greater if Plaintiffs succeeded on all claims at trial and survived an appeal. Each class member will receive a payment based upon his or her number of weeks of employment with Defendants and whether he or she previously submitted a consent to join the FLSA collective. Ex. A (Settlement Agreement) ¶ 3.4(A). In Plaintiffs' counsel's estimation, the settlement represents a significant percentage of the recovery that Plaintiffs would have achieved had they prevailed on all of their claims and survived an appeal and a substantial portion of what Defendants would be able to pay if faced with a judgment. Bien Decl. ¶ 17.

Weighing the benefits of the settlement against the risks associated with proceeding in the litigation, the settlement amount is more than reasonable. "[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell Corp.*, 495 F.2d at 455 n.2. "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982); *see also Cagan v. Anchor Sav. Bank FSB*, No. 88 Civ. 3024, 1990 WL 73423, at *12-13 (E.D.N.Y. May 22, 1990) (approving $2.3 million class settlement over objections that the "best possible recovery would be approximately $121 million").

The determination of whether a settlement amount is reasonable "does not involve the use of a 'mathematical equation yielding a particularized sum.'" *Frank*, 228 F.R.D. at 186 (quoting *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d at 178). "Instead, 'there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Id.* (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

Moreover, when settlement assures immediate payment of substantial amounts to class members, "even if it means sacrificing 'speculative payment of a hypothetically larger amount years down the road,'" settlement is reasonable under this factor. *See Gilliam*, 2008 WL 782596, at *5 (quoting *Teachers' Ret. Sys. of Louisiana v. A.C.L.N. Ltd.*, No. 01 Civ. 11814, 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004)).

**III.  Approval of the FLSA Settlement Is Appropriate Under Federal Law.**

Plaintiffs also request that the Court approve the settlement of their FLSA claims. They have brought their FLSA claims as a collective action. Unlike the procedure under Rule 23, collective members must affirmatively opt into the litigation in order to join it. *See Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 84-85 (S.D.N.Y. 2001). Because, under the FLSA, "parties may elect to opt in but a failure to do so does not prevent them from bringing their own suits at a later date," FLSA collective actions do not implicate the same due process concerns as Rule 23 actions. *McKenna v. Champion Int'l Corp.*, 747 F.2d 1211, 1213 (8th Cir. 1984), *abrogated on other grounds by Hoffmann-LaRoche Inc. v. Sperling*, 493 U.S. 165 (1989); *see also Diaz*, 2010 WL 5507912, at *6. Accordingly, the high standard for approval of a class action under Rule 23 does not apply to an FLSA settlement.

21

Courts approve FLSA settlements when they are reached as a result of contested

litigation to resolve *bona fide* disputes. *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d

1350, 1353 n.8 (11th Cir. 1982); *Diaz*, 2010 WL 5507912, at *6; *deMunecas*, 2010 WL

3322580, at *7. Typically, courts regard the adversarial nature of a litigated FLSA case to be an

adequate indicator of the fairness of the settlement. *Lynn's Food Stores*, 679 F.2d at 1353-54. If

the proposed settlement reflects a reasonable compromise over contested issues, the court should

approve the settlement. *Id.* at 1354; *Diaz*; 2010 WL 5507912, at *6; *deMunecas*, 2010 WL

3322580, at *7. In this case, the settlement was the result of litigation and arm's-length

negotiation involving vigorous back and forth. Bien Decl. ¶¶ 4-17. During the litigation and at

the mediation, Plaintiffs and Defendants were represented by counsel experienced in wage and

hour law. Because the Settlement Agreement resolves a clear and actual dispute waged in

contested litigation and resolved through arm's-length settlement negotiations, it should be

approved.

In connection with Plaintiffs' Motion for Certification of the Settlement Class, Final

Approval of the Class Action Settlement, and Approval of the FLSA Settlement ("Motion for

Final Approval"), filed simultaneously with this motion,[2] Class Counsel respectfully move this

Court for an award of attorneys' fees in the amount of 33% of the Settlement Fund (the "Fund")

and reimbursement of $14,000 in out-of-pocket expenses that were incurred in successfully

prosecuting this action.

Over the past two years, Class Counsel has spent more than 602 attorney, paralegal, and

support staff hours prosecuting this case. Declaration of Rachel Bien in Supp. of Pls.' Mot. for

---

[2]     For a detailed account of the factual and procedural background of this case, Class
Counsel refer the Court to the Memorandum of Law in Support of Plaintiffs' Motion for Final
Approval and the supporting Declaration of Rachel Bien.

Approval of Attorneys' Fees and Reimbursement of Expenses ("Bien Decl.") ¶ 5.  Multiplying

these hours by the hourly rate of each attorney, paralegal, and staff member results in a lodestar

amount of more than $194,000.  Bien Decl. ¶ 7.

Class Counsel's request for thirty-three percent (33%) of the Fund – $145,200 – is less

than their "lodestar" and much less than what courts have awarded in similar cases.  Courts

routinely award counsel two to three times lodestar in class action settlements.  *See, e.g., In re*

*Lloyd's Am. Trust Fund Litig.*, No. 96 Civ.1262, 2002 WL 31663577, at *27 (S.D.N.Y. Nov. 26,

2002) (a "multiplier of 2.09 is at the lower end of the range of multipliers awarded by courts

within the Second Circuit").

Class Counsel's efforts to date have been without compensation, and their entitlement to

payment has been wholly contingent upon achieving a good result.  Bien Decl. ¶ 12.  For the

reasons set forth below, Class Counsel respectfully submit that the attorneys' fees and expense

reimbursement they seek are fair and reasonable under the applicable legal standards, and should

be awarded in light of the contingency risk undertaken and the result achieved in this case.

## IV. CLASS COUNSEL ARE ENTITLED TO A REASONABLE FEE OF THIRTY-THREE PERCENT OF THE SETTLEMENT FUND.

Class Counsel are entitled to reasonable attorneys' fees to compensate them for their

work in recovering misappropriated tips, minimum wages, uniform maintenance costs, and other

unpaid wages on behalf of the class.  The Settlement Agreement provides that "Class Counsel

shall petition the Court for no more than 33% of the Gross Settlement Fund as an award of

attorneys' fees . . . [and] seek reimbursement of reasonable litigation costs . . , which shall not

exceed $25,000."  Ex. C (Settlement Agreement) ¶ 3.2(A).[3]  In addition, the Court-approved

notice ("Notice") that was sent to all class members stated the following:

---

[3]      Unless otherwise indicated, all exhibits are attached to the Bien Declaration.

> Class Counsel will ask the Court to approve payment of up to $145,200 (33% of the $440,000 settlement fund established by Artisanal) for their attorneys' fees. The fees would pay Class Counsel for investigating the facts, litigating the case, and negotiating the settlement. Class Counsel will also ask the Court to approve payment of up to $25,000 for their out of pocket costs.

Ex. E (Notice) ¶14. As of August 30, 2011, no class member has objected to the requested attorneys' fees or expense reimbursement. Bien Decl. ¶ 38. The request for 33% of the Fund plus expenses is reasonable and well within the range approved by courts in similar cases.

### a.   The Percentage Method Is the Preferred Method for Awarding Attorneys' Fees in Common Fund Cases in the Second Circuit.

In wage and hour class action lawsuits, public policy favors a common fund attorneys' fee award. *Willix v. Healthfirst, Inc.*, No. 07 Civ. 1143, 2011 WL 754862, at *6 (E.D.N.Y. Feb. 18, 2011); *deMunecas v. Bold Food, LLC*, No. 09 Civ. 440, 2010 WL 3322580, at *8 (S.D.N.Y. Aug. 23, 2010). Where relatively small claims can only be prosecuted through aggregate litigation, and the law relies on prosecution by "private attorneys general," attorneys who fill that role must be adequately compensated for their efforts. *deMunecas*, 2010 WL 3322580, at *8; *McMahon v. Olivier Cheng Catering & Events, LLC*, No. 08 Civ. 8713, 2010 WL 2399328, at *7 (S.D.N.Y. Mar. 3, 2010); *Sand v. Greenberg*, No. 08 Civ. 7840, 2010 WL 69359, at *3 (S.D.N.Y. Jan. 7, 2010) (statutory attorneys' fees are meant to "encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel"). If not, wage and hour abuses would go without remedy because attorneys would be unwilling to take on the risk. *Willix*, 2011 WL 754862, at *6; *McMahon*, 2010 WL 2399328, at *7; *Sand*, 2010 WL 69359, at *3 ("But for the separate provision of legal fees, many violations of the Fair Labor Standards Act would continue unabated and uncorrected.")

Although there are two ways to compensate attorneys for successful prosecution of

24

statutory claims, the lodestar method and the percentage of the fund method, *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010), the trend in this Circuit is to use the percentage of the fund method in common fund cases like this one, *id.*; *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *deMunecas*, 2010 WL 3322580, at *8.

There are several reasons that courts prefer the percentage method. First, the percentage method "directly aligns the interests of the class and its counsel" because it provides an incentive to attorneys to resolve the case efficiently and to create the largest common fund out of which payments to the class can be made. *Wal-Mart Stores*, 396 F.3d at 122 (internal quotation marks omitted); *In re Ramp Corp. Sec. Litig.*, No. 05 Civ. 6521, 2008 WL 58938, at *2 n.2 (S.D.N.Y. Jan. 3, 2008); *In re Polaroid ERISA Litig.*, No. 03 Civ. 8335, 2007 WL 2116398, at *2 (S.D.N.Y. July 19, 2007); *Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698, 2007 WL 7232783, at *7 (S.D.N.Y. June 25, 2007).

The percentage method is also closely aligned with market practices because it "mimics the compensation system actually used by individual clients to compensate their attorneys." *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 397 (S.D.N.Y. 1999); *see also Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (the percentage method "is consistent with and, indeed, is intended to mirror, practice in the private marketplace where contingent fee attorneys typically negotiate percentage fee arrangements with their clients"); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 432 (S.D.N.Y. 2001) (the court should "determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order"). This rationale is consistent with the Second Circuit's decision in *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 522 F.3d 182, 191 (2d Cir. 2008), where the Court held that a "presumptively reasonable

25

fee" takes into account what a "reasonable, paying client" would pay. While *Arbor Hill* is not controlling because it does not address a common fund fee petition, it supports use of the percentage of the fund method. *Willix*, 2011 WL 754862, at *7; *deMunecas*, 2010 WL 3322580, at *9.

Second, the percentage of the fund method promotes early resolution. It "provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores*, 396 F.3d at 122 (internal quotation marks omitted); *see also In re Ramp Corp. Sec. Litig.*, 2008 WL 58938, at *2 n.2; *In re Polaroid ERISA Litig.*, 2007 WL 2116398, at *2; *Velez*, 2007 WL 7232783, at *7. The percentage method discourages plaintiffs' lawyers from running up their billable hours, one of the most significant downsides of the lodestar method. *Karpus v. Borelli (In re Interpublic Sec. Litig.)*, Nos. 02 Civ. 6527, 03 Civ. 1194, 2004 WL 2397190, at *11 (S.D.N.Y. Oct. 26, 2004).

Third, the percentage method preserves judicial resources because it "relieves the court of the cumbersome, enervating, and often surrealistic process of evaluating fee petitions." *Id.* (quoting *Savoie v. Merchs. Bank*, 166 F.3d 456, 461 n.4 (2d Cir. 1999)). The "primary source of dissatisfaction [with the lodestar method] was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits." *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 48-49 (2d Cir. 2000); *see also In re Ramp Corp. Sec. Litig.*, 2008 WL 58938, at *2 n.2; *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240, 2007 WL 2230177, at *16 (S.D.N.Y. July 27, 2007). While courts still use the lodestar method as a "cross check" when applying the percentage of the fund method, courts are not required to scrutinize the fee records as rigorously. *Goldberger,* 209 F.3d at 50; *see In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004) (using an "implied

26

lodestar" for the lodestar cross check); *Varljen v. H.J. Meyers & Co.*, No. 97 Civ. 6742, 2000

WL 1683656, at *5 (S.D.N.Y. Nov. 8, 2000) (using an "unexamined lodestar figure" for the

lodestar cross check).

> **b.** **The *Goldberger* Factors Support an Award of Thirty-Three Percent of the Fund.**

Reasonableness is the touchstone for determining attorneys' fees.  In *Goldberger*, the

Second Circuit articulated six factors for courts to consider in determining the reasonableness of

fee applications:

(1) the time and labor expended by counsel;

(2) the magnitude and complexities of the litigation;

(3) the risk of litigation;

(4) the quality of representation;

(5) the requested fee in relation to the settlement; and

(6) public policy considerations.

209 F.3d at 50 (quotation marks omitted).  All of the *Goldberger* factors weigh in favor of

granting approval of Class Counsel's fee application.

> **i.** **Class Counsel's Time and Labor**

Class Counsel spent significant effort to achieve the $440,000 settlement.  They obtained,

reviewed, and analyzed hard-copy documents and electronically stored data including, but not

limited to: payroll data and tip sheets, employee handbooks, documents reflecting the duties of

fromagers and maitre d's, service and training manuals, and copies of the minimum wage posters

that Defendants displayed at the restaurant. Bien Decl. ¶ 16.  In addition to electronic and paper

discovery, Class Counsel interviewed class members regarding Defendants' tip distribution

policies, uniform policies, tip credit notice policies, and the duties of individuals who received

27

tips. *Id.* at ¶ 18.

Class Counsel also spent significant time in pre-litigation negotiations, including entering into a tolling agreement to preserve class members' claims, negotiating a confidentiality agreement, and engaging in an informal exchange of documents and other data to assess the claims and calculate damages in advance of private mediation. *Id.* at ¶ 15. Class Counsel also prepared for and attended an all-day mediation with an experienced employment law mediator. *Id.* at ¶ 19. The mediation was not successful, and the parties proceeded to litigate the case. *Id.* at ¶¶ 21-25.

During the litigation, Class Counsel spent significant time preparing to move for conditional certification and to strike Defendants' affirmative defenses, negotiating an FLSA notice, and fielding inquiries from collective members regarding the opt-in process. *Id.* at ¶¶ 22-25. In September 2010, the parties renewed their settlement discussions. *Id.* at ¶ 26. After several months of further negotiation, the parties reached a preliminary agreement on the terms of settlement and reduced them to a formal settlement agreement. *Id.* Class Counsel then prepared and submitted a preliminary approval motion, which was approved by the Court on May 17, 2011. *Id.* at ¶ 28. Since then, Class Counsel has expended time responding to inquiries from class members requesting further information regarding the terms of the settlement and the calculation of their settlement award. *Id.* at ¶ 37.

In performing these tasks, Class Counsel expended more than 602 hours of attorney, paralegal, and staff member time, for an aggregate lodestar of more than $194,000. *Id.* at ¶¶ 5, 7. These hours are reasonable for a case like this one and were compiled from contemporaneous time records maintained by each attorney, paralegal, and support staff participating in the case. *Id.* at ¶ 6. Class Counsel used a small team of attorneys at any one time in order to minimize

duplication of efforts and maximize billing judgment. *Id.* at ¶ 5. Class Counsel made every effort to have work performed by the attorney or paralegal with the lowest hourly rate who was able to effectively perform it. *Id.*

Moreover, the requested fees are not based solely on time and effort already expended; they are also meant to compensate Class Counsel for time that will be spent administering the settlement in the future. *Id.* at ¶ 9. *See deMunecas*, 2010 WL 3322580, at *10 ("The fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward also supports their fee request" of 33% of the fund); *McMahon*, 2010 WL 2399328, at *8 (same); *Parker v. Jekyll & Hyde Entm't Holdings, LLC*, No. 08 Civ. 7670, 2010 WL 532960, at *2 (S.D.N.Y. Feb. 9, 2010) (approving fee award with 1.55 multiplier for lodestar and noting that "as class counsel is likely to expend significant effort in the future implementing the complex procedure agreed upon for collecting and distributing the settlement funds, the multiplier will diminish over time"). In Class Counsel's experience, administering class settlements of this nature and size requires a substantial and ongoing commitment. Bien Decl. ¶ 9. For example, since the Notice was sent out, Class Counsel and staff have responded to inquiries from class members requesting information regarding the terms of the settlement and the amount of their settlement award. *Id.* at ¶ 37. Class Counsel expects to respond to more class member inquiries after final approval, especially after checks are issued. *Id.*

### ii.    Magnitude and Complexity of the Litigation.

The size and difficulty of the issues in a case are significant factors to be considered in making a fee award. *Goldberger*, 209 F.3d at 50; *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 912 F. Supp. 97, 100-01 (S.D.N.Y. 1996). Courts have recognized that wage and hour cases

involve complex legal issues. "FLSA claims typically involve complex mixed questions of fact and law . . . . These statutory questions must be resolved in light of volumes of legislative history and over four decades of legal interpretation and administrative rulings." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981).

Among FLSA cases, the most complex type is the "hybrid" action brought here, where state wage and hour violations are brought as an "opt out" class action pursuant to Federal Rule of Civil Procedure 23 in the same action as the FLSA "opt in" collective action pursuant to 29 U.S.C. § 216(b). Because the same set of operative facts is being applied and analyzed under both statutory frameworks, justice is served and consistency and efficiency are achieved by having the litigation in one forum. *See Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 89 (S.D.N.Y. 2001).

This case hinged on several mixed questions of fact and law. In particular, the parties disputed the facts surrounding the job duties of fromagers and maitre d's whom Plaintiffs alleged were tip-ineligible, and the legal question of whether their duties rendered them ineligible to receive tips under the FLSA and NYLL. These mixed factual and legal questions support approval of Class Counsel's attorneys' fee request. *See deMunecas*, 2010 WL 3322580, at *7-8 (awarding O&G attorneys' fees of 33% of the common fund in restaurant case involving tip misappropriation and minimum wage violations).

### iii.     Risk of Litigation.

The risk of litigation is also an important factor in determining a fee award. Uncertainty that an ultimate recovery will be obtained is highly relevant in determining the reasonableness of an award. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir. 1974), *abrogated by Goldberger,* 209 F.3d 43 (2d Cir. 2000). "[D]espite the most rigorous and competent of efforts,

success is never guaranteed." *Id.* at 471.

Class Counsel undertook to prosecute this action without any assurance of payment for their services, litigating this case on a wholly contingent basis in the face of tremendous risk. Bien Decl. ¶ 10. Class and collective wage and hour cases of this type are, by their very nature, complicated and time-consuming. *Id.* Lawyers undertaking representation of large numbers of affected employees in such actions inevitably must be prepared to make a tremendous investment of time, energy, and resources. *Id.* Due also to the contingent nature of the customary fee arrangement, lawyers are asked to be prepared to make this investment with the very real possibility of an unsuccessful outcome and no fee of any kind. *Id.* Class Counsel stood to gain nothing in the event the case was unsuccessful. *Id.*

Moreover, the circumstances of this case presented hurdles to a successful recovery. *Id.* at ¶ 12. For example, the tip misappropriation claim hinged on Plaintiffs' ability to prove that the fromagers and maitre d's who received tips performed duties that made them ineligible for tips. *Id.* This fact-intensive inquiry contributed to the complexity of this case because Defendants' witnesses disputed the facts presented by Plaintiffs, giving rise to credibility issues and significant risk at trial. *Id.* This factor therefore weighs in favor of granting the requested fees. *See, e.g.*, *Brunson v. City of N.Y.*, Nos. 94 Civ. 4507, 94 Civ. 5632, 2000 WL 1876910, at *4 (S.D.N.Y. Dec. 22, 2000) (where class counsel "faced significant obstacles . . . verifying . . . tasks performed by individual plaintiffs," class counsel was entitled to a 50% premium for their achievement of a settlement).

### iv.     Quality of Representation.

"To determine the 'quality of the representation,' courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v.*

*Ackermans*, No. 02 Civ. 7951, 2007 WL 414493, at \*10 (S.D.N.Y. Jan. 31, 2007) (citing *In re Global Crossing*, 225 F.R.D. at 467).

Defendants agreed to pay a total of $440,000 to settle this litigation. Each class member who has not opted out will receive a payment based on the number of weeks worked between June 17, 2003 and January 31, 2011, and whether the class member opted in to the FLSA collective. Ex. C (Settlement Agreement) ¶ 3.4(A). The class is comprised of 394 individuals. Bien Decl. ¶ 32; Ex. D (Patton Decl.) ¶ 8. Weighing the benefits of the settlement against the risks associated with proceeding in the litigation, the settlement is reasonable. The settlement amounts will be available to class members without the uncertainty and delay of trial.

Class Counsel has substantial experience prosecuting large-scale wage and hour class and collective actions. *See Clark v. Ecolab*, Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2010 WL 1948198 (S.D.N.Y. May 11, 2010), at \*8 ("Class Counsel are experienced class action employment lawyers and have extensive experience prosecuting and settling wage and hour class actions"); *McMahon*, 2010 WL 2399328, at \*6 (O&G are "experienced employment lawyers with good reputations among the employment law bar").

Class Counsel's skill and experience were directly responsible for the favorable settlement and weigh in favor of granting the requested fees. Bien Decl. ¶4; *Velez*, 2007 WL 7232783, at \*8 (holding that "Lead Counsel's experience representing plaintiffs in class actions" supported a 33.33% contingency fee award); *Frank*, 228 F.R.D. at 189 (citing plaintiffs' counsel's experience as one factor supporting an attorneys' fee award of 40% of the fund).

### v.     Fee in Relation to the Settlement.

Courts also consider the size of the settlement to ensure that the percentage awarded does not constitute a "windfall." *See, e.g., In re Gilat Satellite Networks, Ltd.*, No. 02 Civ. 1510, 2007

WL 2743675, at *16 n.41 (E.D.N.Y. Sept. 18, 2007). "[T]he percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement." *Id.* (quoting *In re Indep. Energy Holdings PLC Sec. Litig.*, No. 00 Civ. 6689, 2003 WL 22244676, at *6 (S.D.N.Y. Sept. 29, 2003)) (internal quotation marks omitted). Where the size of the fund is relatively small, courts typically find that requests for a greater percentage of the fund are reasonable. *See, e.g., In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675, at *16 n.41 (finding a 30% fee would not constitute a windfall "given the modest size of the [$20 million] settlement").

The modest size of the $440,000 settlement weighs in favor of granting the requested fee award of 33% of the common fund. *See deMunecas*, 2010 WL 3322580, at *8 (awarding 33% of $800,000 fund in FLSA and NYLL tip misappropriation case); *Prasker v. Asia Five Eight LLC*, No. 08 Civ. 5811, 2010 WL 476009, at *6 (S.D.N.Y. Jan. 6, 2010) (awarding approximately one-third of $1,050,000 fund in FLSA and NYLL restaurant case); *Mohney v. Shelly's Prime Steak*, No. 06 Civ. 4270, 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009) (awarding 33% of $3,265,000 fund in FLSA and NYLL tip misappropriation case).

In fact, courts in this Circuit have routinely granted requests for one-third of the fund in cases with settlement funds substantially larger than this one. *See, e.g.*, *Willix*, 2011 WL 754862,at *6 (awarding class counsel one-third of $7,675,000 settlement fund in FLSA and NYLL wage and hour action); *Clark*, 2010 WL 1948198, at *8-9 (awarding class counsel 33% of $6 million settlement fund in FLSA and multi-state wage and hour case); *Khait v. Whirlpool Corp.,* No. 06 Civ. 6381, 2010 WL 2025106, at *8  (E.D.N.Y. Jan. 20, 2010) (awarding class counsel 33% of $9.25 million settlement fund in FLSA and multi-state wage and hour case); *Westerfield v. Wash. Mut. Bank*, Nos. 06 Civ. 2817, 08 Civ.0287, 2009 WL 5841129, at *4-5

33

(E.D.N.Y. Oct. 8, 2009) (awarding 30% of $38 million fund in nationwide overtime suit). This is true even though "[a]s the size of the settlement fund increases, the percentage of the fund awarded as fees often decreases so as to prevent a windfall to plaintiffs' attorneys." *Hicks v. Morgan Stanley*, No. 01 Civ. 10071, 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) (internal quotation marks omitted). A fee of 33% of the Settlement Fund is reasonable and "consistent with the norms of class litigation in this circuit." *Willix*, 2011 WL 754862, at *7 (quoting *Gilliam v. Addicts Rehab. Ctr. Fund*, No. 05 Civ. 3452, 2008 WL 782596, at *5 (S.D.N.Y. Mar. 24, 2008)).

### vi.     Public Policy Considerations.

Public policy considerations weigh in favor of granting Class Counsel's requested fees. In rendering awards of attorneys' fees, "the Second Circuit and courts in this district also have taken into account the social and economic value of class actions, and the need to encourage experienced and able counsel to undertake such litigation." *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d at 399.

The FLSA and the NYLL are remedial statutes designed to protect the wages of workers. *See A.H. Phillips v. Walling,* 324 U.S. 490, 493 (1945) (recognizing the FLSA's objective – ensuring that every employee receives "a fair day's pay for a fair day's work") (internal quotation marks omitted). Where relatively small claims can only be prosecuted through aggregate litigation, and the law relies on prosecution by "private attorneys general," attorneys who fill the private attorney general role must be adequately compensated for their efforts. *Willix*, 2011 WL 754862, at *6; *deMunecas*, 2010 WL 3322580, at *8; *McMahon*, 2010 WL 2399328, at *7. If not, wage and hour abuses would go without remedy because attorneys would be unwilling to take on the risk. *Willix*, 2011 WL 754862, at *6; *deMunecas*, 2010 WL

34

3322580, at *8; *McMahon*, 2010 WL 2399328, at *7.Adequate compensation for attorneys who

protect those rights by taking on such litigation furthers the remedial purpose of those statutes.

*Willix*, 2011 WL 754862, at *6; *deMunecas*, 2010 WL 3322580, at *8; *McMahon*, 2010 WL

2399328, at *7; *see also Sand*, 2010 WL 69359, at *3 ("But for the separate provision of legal

fees, many violations of the Fair Labor Standards Act would continue unabated and

uncorrected.")

Courts have recognized that fee awards in cases like this serve the dual purposes of

encouraging "private attorneys general" to seek redress for violations and discouraging future

misconduct of a similar nature. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338-39

(1980); *Khait*, 2010 WL 2025106, at *8, *Prasker*, 2010 WL 476009, at *6. Class actions are also

an invaluable safeguard of public rights. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809

(1985); *J.I. Case Co. v. Borak*, 377 U.S. 426, 433-34 (1964). Particularly where, as here, the

settlement fund is relatively small, an award of attorneys' fees ensures that "plaintiffs' claims

[will] likely . . . be heard." *Frank*, 228 F.R.D. at 189. If courts denied sufficient attorneys' fees

"no attorneys . . . would likely be willing to take on . . . small-scale class actions[.]" *Id.*;

*deMunecas,* 2010 WL 3322580, at *8; *Sand*, 2010 WL 69359, at *3.

## V. <u>THE LODESTAR CROSS CHECK FURTHER SUPPORTS AN AWARD TO</u> <u>CLASS COUNSEL OF 33% OF THE SETTLEMENT FUND</u>

Following *Goldberger*, the trend in the Second Circuit has been to apply the percentage

method and loosely use the lodestar method as a "baseline" or as a "cross check." *Goldberger*,

209 F.3d at 50. The Second Circuit "encourages the practice of requiring documentation of

hours as a 'cross check' on the reasonableness of the requested percentage." *Id.; see also*

*Parker*, 2010 WL 532960, at *2. As part of the cross check, the lodestar is determined by

multiplying the hours reasonably expended on the case by a reasonable hourly rate. *Hicks*, 2005

WL 2757792, at *8. Courts then consider whether a multiplier is warranted based on factors, such as: (1) the contingent nature of the expected compensation for services rendered; (2) the consequent risk of non-payment viewed as of the time of filing the suit; (3) the quality of representation; and (4) the results achieved. *In re Boesky Sec. Litig.*, 888 F. Supp. 551, 562 (S.D.N.Y. 1995); *see also Goldberger*, 209 F.3d at 47; *Savoie*, 166 F.3d at 460; *Parker*, 2010 WL 532960, at *2.

Courts regularly award lodestar multipliers from two to six times lodestar. *See, e.g., In re Lloyd's Am. Trust Fund Litig.*, 2002 WL 31663577, at *27 (a "multiplier of 2.09 is at the lower end of the range of multipliers awarded by courts within the Second Circuit"); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (the "modest multiplier of 4.65 is fair and reasonable"); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (awarding multiplier of 3.97 times lodestar); *In re RJR Nabisco, Inc. Sec. Litig.*, MDL No. 818, No. 88 Civ. 7905, 1992 WL 210138, at *5-8 (S.D.N.Y. Aug. 24, 1992) (awarding multiplier of 6); *Rabin v. Concord Assets Grp., Inc.,* No. 89 Civ. 6130, 1991 WL 275757, at *1-2 (S.D.N.Y. Dec. 19, 1991) (awarding multiplier of 4.4). In calculating the lodestar for cross check purposes, the "hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50. Rather, "the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case . . . ." *Id.*

Class Counsel spent more than 602 hours litigating and settling this matter. Bien Decl. ¶ 5. The time spent by Class Counsel is described in the Declaration of Rachel Bien and Class Counsel's contemporaneous time records attached thereto. *Id.* at ¶¶ 7-8; Ex. A (Time Summary); Ex. B (Time Records). The hours worked by Class Counsel result in a lodestar of more than $194,000. Bien Decl. ¶ 7. Compared to the multipliers of two to six times lodestar that are

regular awarded in this district, Class Counsel's request for approximately 75% of their lodestar – $145,200 – is well within the range of reasonable.

## VI. CLASS COUNSEL ARE ENTITLED TO REIMBURSEMENT OF EXPENSES UNDER THE SETTLEMENT AGREEMENT

Class Counsel request reimbursement of $14,000 in out-of-pocket expenses to be paid from the Fund. "Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were 'incidental and necessary to the representation' of those clients." *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) (internal quotation marks omitted). Here, the Settlement Agreement allows Class Counsel to seek reimbursement of up to $25,000 in expenses and costs. Ex. C (Settlement Agreement) ¶ 3.2(A). Class Counsel's actual costs and expenses of approximately $14,000 were considerably less than this amount, and were incidental and necessary to the representation of the Class. Bien Decl. ¶ 5. These expenses include Plaintiffs' share of the mediator's fees, the fees charged by the claims administrator who mailed the 216(b) notice to collective members, telephone charges, postage, transportation and working meals costs, photocopies, and electronic research. *Id.*

## VII.  THE CLASS REPRESENTATIVES ARE ENTITLED TO SERVICE AWARDS

Finally, plaintiffs move for service awards in the amount of $10,000 each for the four class representatives. Given the contribution made by the four named plaintiffs to the prosecution of this action, and the reasonable amount of the proposed awards, the motion is granted. <u>Bowers v. Atl., Maint. Corp.</u>, 546 F. Supp. 2d 55, 80 (E.D.N.Y. 2008); <u>Frank v. Eastman Kodak Co.</u>, 228 F.R.D. 174, 187 (W.D.N.Y. 2005).

## CONCLUSION

The motions at Dockets No. 62, 65 and 67 are GRANTED and the Clerk of the Court is directed to removed those motions from the court's list of outstanding motions, and to close this case.

This constitutes the decision and order of the court.

Dated: September 16, 2011

U.S.D.J.

BY HAND AND BY ECF TO ALL COUNSEL

38